Opinion by Judge REINHARDT; Dissent by Judge CLIFTON.
OPINION
REINHARDT, Circuit Judge:
The Board of Immigration Appeals (BIA) determined that Petitioner Salomon Ledezma-Cosino was not eligible for cancellation of removal or voluntary departure because, under 8 U.S.C. § 1101(f)(1), as a “habitual drunkard” — that is, a person with chronic alcoholism — he inherently lacked good moral character. He now petitions for review, contending that the Due Process Clause and Equal Protection Clause of the Constitution forbid the Government from making such an irrational classification as to moral character on the basis of a medical disability. We hold *1073 that, under the Equal Protection.Clause, a person’s medical disability lacks any rational relation to his classification as a person with bad moral character, and that § 1101(f)(1) is therefore unconstitutional: We grant the petition for review, vacate the BIA’s decision, and remand for further proceedings in light of this opinion.
JURISDICTION AND: STANDARD OF REVIEW
We have jurisdiction under 8 U.S.C. § 1252(a)(2)(D) to review constitutional claims raised upon a petition for reviéw. Cabrera-Alvarez v. Gonzales, 423 F.3d 1006, 1009 (9th Cir.2005). This includes any alleged “colorable constitutional violation.” Martinez-Rosas v. Gonzales, 424 F.3d 926, 930 (9th Cir.2005). As the BIA lacks jurisdiction to rule upon the constitutionality of the statutes it administers, In re Fuentes-Campos, 21 I. & N. Dec. 905 (BIA 1997), it did not rule on the constitutional claim raised by petitioner, We review that claim de novo. Chavez-Perez v. Ashcroft, 386 F.3d 1284, 1287 (9th Cir.2004).
BACKGROUND
Even when the government may deport a non-citizen, the Attorney General has the discretion not to do so by, among other avenues, cancelling the removal under ‘8 U.S.C. § 1229b or allowing the non-citizen to voluntarily depart the country under 8 U.S.C. § 1229c. Each of these avenues provides a benefit for the non-citizen. The benefit of cancellation is obvious: the non-citizen may remain in the country. Voluntary departure’s benefit is less intuitive, but no less important to the many non-citizens who receive this form of relief. If a non-citizen can voluntarily depart rather than be deported, “he or she avoids extended detention pending completion of travel arrangements; is allowed to choose when to depart (subject to certain constraints); and can select the country of destination. And, of great importance, by departing voluntarily the alien, facilitates the possibility of readmission.” Dada v. Mukasey, 554 U.S. 1, 11, 128 S.Ct. 2307, 171 L.Ed.2d 178 (2008).
Congress limited eligibility for cancellation or voluntary departure to non-citizens of - “good moral character.” 8 U.S.C. §§ 1229b(b)(l)(B); 1229c(b)(l)(B). Given the presumed difficulty .of enumerating traits demonstrating good moral-character, the relevant statute defines good moral character by listing the categories of people who lack it. 8 U.S.C. § 1101(f). This list includes, among others, .people who have participated in genocide or torture, been convicted of an aggravated felony or several gambling offenses, spent 180 days in custody as a result of a conviction or convictions, lied to obtain a benefit in immigration proceedings, and people who are “habitual drunkard[s].” Id. (containing full list). Any person deemed to lack good moral character may not be considered for discretionary relief.
Ledezmar-Cosino is a person who was determined to lack good moral character by virtue of'his classification as a “habitual drunkard” under the statutory provision. He is a citizen of Mexico who entered the United States in 1997 without being legally admitted and has been in the country since that time except for a few brief departures. He has eight children, five of whom are United States citizens. He supports his family by working in the construction industry.
He is also a chronic alcoholic or a “habitual drunkard.” His medical records state that he has a ten-year history of alcohol abuse, during which he drank an average of one liter of tequila each day. Examining doctors have diagnosed him with acute alcoholic hepatitis,- decompensated cirrho *1074 sis of the liver, and alcoholism. His abuse of alcohol has led to at least one DUI conviction.
Immigration and Customs Enforcement (ICE) detained Ledezma-Cosino in 2008. Over several hearings in front of the Immigration Judge (IJ), he conceded remova-bility but sought cancellation of removal or voluntary departure. The IJ denied relief for several reasons; but the BIA affirmed solely on the ground that Ledezma-Cosino was ineligible because he lacked good moral character as a “habitual drunkard.” The BIA recognized that Ledezma-Cosino raised a constitutional argument about this classification but noted that it does not have jurisdiction over constitutional issues.
Following the BIA’s denial of his appeal from the IJ, Ledezma-Cosino petitioned for reviéw. After oral argument, we ordered supplemental briefing on the question whether' §' 1101(f)(1) violates due process or equal protection on the ground that chronic alcoholism is a medical condition not rationally related to the presence or absence of good moral character.
DISCUSSION
Ledezma-Cosino argues that the denial of his request fpr cancellation of removal or voluntary departure on the ground that he lacks good moral character because he is “a habitual drunkard” deprives him of due process and equal protection of the law. We first address whether he has a protectable liberty interest for his due process claim and then turn to his equal protection argument.
I
The Government first argues that Ledezma-Cosino is unable to raise a due process or equal protection claim because non-citizens lack a protectable liberty interest in discretionary relief. We agree that non-citizens cannot challenge denials of discretionary relief under the due process clause because they do not have a protectable liberty, interest in a privilege created by Congress. Tovar-Landin v. Ashcroft, 361 F.3d 1164, 1167 (9th Cir.2004); Munoz v. Ashcroft, 339 F.3d 950, 954 (9th Cir.2003). An equal protection claim, however, does not require a liberty interest, Sandin v. Conner, 515 U.S. 472, 487 & n. 11, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (holding that prisoner had no liberty interest for the purpose of the due process clause, but that he may nonetheless challenge arbitrary state action under the equal protection clause). Accordingly, Ledezma-Cosino is barred from raising a due process claim but may raise an equal protection challenge.
n.
“The Equal Protection Clause of the Fourteenth Amendment commands that no State shall ‘deny to any person within its jurisdiction the equal protection of the laws,’ which is essentially a direction that all persons similarly situated • should be treated alike.” City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The Supreme Court has long held that the constitutional promise of equal protection of the laws applies to non-citizens as well as citizens. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Although Congress’s power to regulate the exclusion or admission of non-citizens is extremely broad, see Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); Perez-Oropeza v. INS, 56 F.3d 43, 45 (9th Cir.1995), a classification between noncitizens who are otherwise similarly situated nevertheless violates equal protection unless it' is rationally related to a legitimate government interest, Jimenez-Angeles v. Ashcroft, 291 F.3d 594, 603 (9th *1075 Cir.2002). Here, the government interest is in excluding persons of bad moral character. The Government “may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.” City of Cleburne, 473 U.S. at 446, 105 S.Ct. 3249. The absence of a rational relationship between a medical disease and bad moral character therefore renders- any classification based on that relationship a violation of the Equal Protection Clause.
At the outset, it is apparent from the face of the statute that Congress has created a classification dividing “habitual drunkards” — i.e. persons with chronic alcoholism — from persons who do not suffer from the same disease-and identifying the former as necessarily lacking good moral character. Although acknowledging the classification, the Government maintains that the statute does not target a status (alcoholism) but rather specific symptoms (habitual and excessive drinking)'and that we therefore should not be concerned that the statute classifies a medical condition as constituting bad moral • character. The Government is wrong. Just as a statute targeting people who exhibit" manic and depressive behavior would be, in effect, targeting people with bipolar disorder and just as a statute targeting people who exhibit delusional conduct over a long period of time would be, in effect, targeting individuals with schizotypal personality disorder, a statute targeting people who habitually and excessively drink alcohol is, in effect, targeting individuals with chronic alcoholism. Cf. Christian Legal Soc’y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 689, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010) (declining to distinguish between status and conduct in cases in which the conduct was intertwined with the status). The Government’s argument does not in fact advance the resolution of the issue before us. It simply states the obvious. Every person who is, by definition, a habitual drunkard will regularly exhibit the symptoms of his disease by drinking alcohol excessively. See Black’s . Law Dictionary (10th ed. 2009) (defining “habitual drunkard” as “someone, who consumes intoxicating substances excessively; esp., one who is often intoxicated,” and “[a]n alcoholic”).
Given the classification in the statute, the question becomes whether Congress’s disparate treatment of individuals with alcoholism is “rationally related to ,a legitimate state interest” in denying discretionary relief to individuals who lack good moral character. Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1065 (9th Cir.2014). In other words, is it rational for the government to find that people with chronic alcoholism are morally bad people solely because of their disease?
The answer is no. Here, the Government concedes that alcoholism is a medical condition, as we have long recognized to be the case. Griffis v. Weinberger, 509 F.2d 837, 838 (9th Cir.1975) (“The proposition that chronic acute alcoholism- is itself a disease, ‘a medically determinable physical or mental impairment,’ is- hardly debatable today.”). Like any other medical condition, alcoholism is undeserving of punishment and should not be held morally offensive. Powell v. Texas, 392 U.S. 514, 549-51, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (White, J., concurring) (describing chronic alcoholism as a “disease” and stating .that “the chronic alcoholic with an irresistible urge to. consume alcohol should not.be punishable for drinking or for being drunk”). Although people with-'alcoholism continue to face stigma, “[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.” City of Cleburne, 473 U.S. at 448, 105. S.Ct. 3249 *1076 (quoting Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984)). We are wéll past the point where it is rational to link a person’s medical disability with his moral character.
The Government first argues that persons suffering from alcoholism are morally blameworthy because they simply lack the motivation to overcome their disease. The study o.n which the Government relies, W.R. Miller, Motivation for Treatment: A Review With Special Emphasis on Alcoholism, 98 Psychological Bulletin 84, (1985) (Ex. A), does not support the proposition that alcoholics jack motivation. The study actually refutes the proposition urged by the Government, noting that the “trait model,” according to which alcoholics employ defense mechanisms because they lack sufficient motivation to stop drinking,
ha[s] failed to find support in the empirical literature. Extensive searches for “the alcoholic personality” have revealed few definitive traits or patterns typical of alcoholics beyond those directly attributable to the effects of overdrinking. The character defense mechanism of denial has been found to be no more frequent among alcoholics than among non-alcoholics.
Id. Put differently, the theory that alcoholics- are blameworthy because they could simply try harder to recover is., an old trope not supported by the medical literature; rather, the inability to stop drinking is a function of the underlying ailment.
The Government’s position to the contrary has deplorable, troubling, and wholly unacceptable implications. Taking the Government’s logic as true, a disproportionate number of today’s veterans, many of whom suffer from Post Traumatic Stress Disorder, would lack good moral character because they are consumed by— and cannot overcome — their - alcoholism. See Andrew Saxon, Reluming Veterans with Addictions, Psychiatric Times (July 14, 2011), http://www.psychiatrictimes.com/ military-mental-health/returning-veterans-addictions/ (noting that 12% ■ to 15% of recently deployed veterans to Iraq tested positive for alcohol problems); Thomas Brinson & Vince Treanor, Vietnam Veterans and Alcoholism, The WA Veteran (August' 1984), http://www.wa.org/archive/ TheVeteran/2005_03/feature_alcoholism. htm (“[Thirty-six] percent of the Vietnam veterans studied demonstrated alcoholism or significant alcohol-related problems which could develop into alcoholism.”); National Center for PTSD, Department of Veterans Affairs, http://www.ptsd.va.gov/ publie/problems/ptsd_substance_abuse_ veterans.asp (noting that PTSD and substance abuse often occur simultaneously in veterans and that 1 in 10 returning soldiers from Iraq and Afghanistan seen at Veterans Affairs hospitals have a substance abuse problem); Magdalena Cérda et al., Civilian Stressors Associated with Alcohol Use Disorders in the National Guard, 47 Am. J. of Preventative Med. 461 (2014) (noting that soldiers in the National Guard have double the rate of ■ alcohol abuse and linking this high rate to civilian stressors — including- family disruption, problems with health insurance, and legal problems — caused by intermittent deployment). A disproportionate number of Native Americans similarly would be classified as lacking good moral character under the Government’s theory. See RJ Lama-rine, Alcohol Abuse Among Native Americans, 13 J. Community Health 143, 143 (1988) (“Epidemiological data indicate that elevated morbidity and mortality attributable to alcohol abuse among [Native Americans] remain at epidemic levels.”); Palash Ghoash, Native Americans: The Tragedy of Alcoholism, International Business Times (Feb. 11, 2012), http://www.ibtimes. com/native-americans-tragedy-alcoholism-214046 (“According to the Indi *1077 an Health Services, the rate of alcoholism among Native Americans is six times the U.S. average.”); Patricia Silk-Walker et al., Alcoholism, Alcohol Abuse, and Health in American Indians and Alaska Natives, 1 Am. Indian and Alaska Native Mental Health Res. 65 (1988) (“[Four] of the top 10 causes of death among American Indians are attributable in large part, to alcohol abuse____”). Finally, a disproportionate number of people who áre homeless would not only be deprived of the government assistance they so desperately need but they would be officially condemned as bad people, undeserving of such help. Dennis McCarty et al., Alcoholism, Drug Abuse, and the Homeless, 46 Am. Psychologist 1139 (1991) (citing credible estimates' that alcohol abuse affects 30% to 40% of homeless persons); Substance Abuse & Mental Health Servs. Admin., Current Statistics on the Prevalence and Characteristics of People Experiencing Homelessness in the United States, at 2 (2011) (same). Surely, the Government does not seriously assert that the veterans of the wars in Vietnam, Iraq, and- Afghanistan who suffer from chronic alcoholism, as well as a highly disproportionate number of Native Ameri-cans, and a substantial portion of America’s homeless population are all people of bad moral character.
The Government next contends that individuals suffering from habitual alcoholism have bad moral character because they “are at an increased risk of committing acts of violence or self-harm,” citing several studies to the effect that alcoholism leads to the commission of certain crimes. See D.W. Webster & J.S. Verniek, Keeping Firearms From Drug and Alcohol Abusers, 15 Inj. Prev. 425 (2009) (Ex. B) (arguing that alcohol abusers should be barred from acquiring firearms because of the increased risk of violence); Phyllis W. Sharps et al., The Role of Alcohol Use in Intimate Partner Femicide, 10 Am. J. Addictions 122, 133 (2001) (Ex. C) (discussing the link between alcohol and intimate partner violence); Frederick P. Rivara et al., Alcohol and Illicit Drug Abuse and the Risk of Violent Death in the Home, 278 JAMA 569 (1997) (Ex. D)' (noting that alcohol abuse is linked to being a victim of homicide and suicide); Gary M. McClel-land et al., Alcohol Intoxication and Violent Crime: Implications for Public Health Policy, 10 Am. J. Addictions 70 (2000) (Ex. E) (tracing the relation between police encounters and alcohol). Several of these studies have no link to moral culpability at all; even the Government would concede that being a victim of a crime or committing suicide does not show poor moral character. More important, the link between alcohol and violence does not make being the victim of the disease of alcoholism equivalent to possessing poor moral character. Indeed, although individuals with bipolar, disorder have a lifetime incidence of aggressive behavior 14 to 25 percentage points higher than average and are at greater risk of self-harm, Jan Volavka, Violence in Schizophrenia and Bipolar Disorder, 25 Psychiatria Danubina 24, 27 (2013); KR Jamison, . Suicide and Bipolar Disorder, 61 J. Clinical Psychiatry 47-51 (2000), no one would suggest that people with bipolar disease lack good moral character. Alcoholism is no different. On a similar note, the Government points to state laws that bar individuals with alcoholism from carrying firearms and policies that bar individuals with alcoholism- from obtaining residence at- the U.S. Soldiers’ and Airmen’s Home as evidence that people,with alcoholism pose a particular moral threat. These examples are irrelevant. Unlike the statute at issue, these policies are designed for a different purpose — the avoidance of unnecessary conflict — not to limit activities of alcoholics *1078 because they lack good moral character.[1]
The Government last argues that “habitual drunkards have been the target of laws intending .to protect society since the infancy of the nation” and that such history proves the rationality of the legislation. History is a useful guide in this case, but it undercuts rather than buttresses the Government’s argument. B.ecause of the failure to understand mental illness, people with mental disabilities have in the past faced severe prejudice. City of Cleburne, 473 U.S. at 438, 105 S.Ct. 3249. The veiy article the Government cites points to a darker origin for the targeting of habitual drunkards by immigration laws. The article contends that the laws, passed in the mid-1950s, “operated as forms of social control over immigrants and were driven by economic, political and xenophobic impulses” rather than a concern over moral character. Jayesh Rathod, Distilling Americans: The Legacy of Prohibition on U.S. Immigration Law, 51 Hous. L. Rev. 781, 846 (2013); see also id. at 823. As we recently learned in the context of laws discriminating on the basis of sexual orientation, “new insights and societal understandings can reveal unjustified inequality ... that, once passed unnoticed and unchallenged.” Obergefell v. Hodges, — U.S. —, 135 S.Ct. 2584, 2603, 192 L.Ed.2d 609 (2015). These new insights are particularly common in the field of mental health, where the Supreme Court has shifted from upholding sterilization of the mentally ill, notoriously declaring that “[tjhree generations of imbeciles are enough,” Buck v. Bell, 274 U.S. 200, 207, 47 S.Ct. 584, 71 L.Ed. 1000 (1927), to deploring the “grotesque mistreatment” of. those with intellectual and mental disabilities, City of Cleburne, 473 U.S. at 438, 105 S.Ct. 3249. Here,-the over half-century that has passed since the “habitual drunkard” clause took effect has provided similar new insights in treating alcoholism as a disease rather than a character defect.
If anything, history tells us that animus was the impetus, behind the law. That animus, of qourse, “is not a legitimate state interest.” Ariz. Dream Act, 757 F.3d at 1067 (citing Romer v. Evans, 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)). We have also been taught through the passage of time that classifying alcoholics as evil people,, rather than as individuals suffering from a disease, is neither rational nor consistent with our fundamental values. In sum, the Government’s reliance on history not only fails to support the singling out of chronic alcoholics as without moral character but tells us that such a classification is violative of the Equal Protection Clause of our Constitution.
CONCLUSION
There is no rational basis for classifying persons afflicted by chronic alcoholism as persons who innately lack good moral character. As. such, . we hold 8 U.S.C. § 1101(f)(1) unconstitutional, vacate the BIA’s decision, and remand for further proceedings consistent with this opinion.
VACATED and REMANDÉD.

. What actions may be taken to limit the possibility that individuals suffering from chronic alcoholism- will commit criminal acts is another question, one not necessary for us to consider here, although banning them from possessing firearms or driver’s licenses are • obvious areas for consideration. Similarly, when or how persons with chronic alcoholism may be punished for criminal acts committed while in an alcoholic state is another question to be considered elsewhere. .None of this has anything to do, however, with whether individuals suffering from the disease of alcoholism are innately without good moral character.