**Helena URBAN, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 96–3815.**

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1997.

Decided Aug. 21, 1997.

Kalman Resnick, Gary N. Chodorow (argued), Gessler, Hughes & Socol, Limited, Chicago, IL, for Petitioner.

Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, David M. McConnell, Kristal A. Marlow, James A.

Hunolt, Stephen W. Funk (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Helena Urban is a widowed, 65–year–old Polish citizen. In August 1985 she left her communist homeland and entered the United States as a nonimmigrant visitor for pleasure. She overstayed her visa, and in 1992 the INS commenced deportation proceedings. Urban conceded deportability but applied for suspension of deportation under § 244(a)(1) of the Immigration and Nationality Act. An immigration judge denied her request, finding Urban was not eligible for suspension of deportation because she had not shown that she would suffer extreme hardship if deported. The Board of Immigration Appeals, sitting *en banc*, affirmed,[1] and this appeal followed. Because we conclude the Board failed to adequately consider a number of factors relevant to extreme hardship, we reverse and remand Urban's case to the Board for further proceedings. First, the facts.

Urban was born in rural Poland in 1932. Because her family was poor, Urban received only a limited education. In all, she attended grade school for 5 years. However, because her family could not afford to buy her warm clothes, Urban did not attend school in the winter. Urban married at age 18, and she and her husband had three children: Krystyna, Tadeusz, and Ewa. When her youngest child was 8 years old Urban's husband died. After his death Urban attempted to support her children by farming. Several years before leaving Poland, however, she became unable to handle the work and moved in with her son, Tadeusz, who had landed a job as an agricultural engineer. Until she left for the United States, Urban looked after Tadeusz's children and tried to earn a few zlotys here and there by selling hand-sewn embroidery pieces.

In August 1985 Urban left Poland and entered the United States on a 6–month tourist visa. She immediately applied for asylum (apparently that request was denied) and received employment authorization. From 1985 to 1988 she worked as a babysitter. Since then she has cleaned office buildings in metropolitan Chicago. She generally works weekdays from 5 p.m. to midnight and nets around $600 per month. She has consistently paid her taxes and never received public assistance. As of October 1996 she had earned approximately 37 of the 40 credits needed to qualify for social security. If she has continued to work, Urban will qualify for a modest pension around the time this opinion is issued.

Urban has lived with Maria and Stanley Orzel since 1988, and in exchange for room and board she takes care of the Orzels' daughter, Michelle. For example, because Maria Orzel at one time worked from 7 a.m. to 7 p.m. each day, Urban walked Michelle to and from school and prepared her meals. Michelle, for what it's worth, calls Urban "Grandma."

Urban uses some of her modest income to support her children, who are barely making ends meet in Poland. Ewa, who is married to an often-unemployed coal miner, has two kids, and lives with her in-laws, receives the most regular support. Urban sends her at least $100 per month to help feed her family.[2]

---

1. While Urban's appeal to the Board was pending, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996) (IIRIRA). The Act, which generally became effective on April 1, 1997, "replaced" suspension of deportation with a new, more limited remedy entitled "cancellation of removal." However, with a few exceptions, none of which are relevant to this appeal, IIRIRA does not apply to applications for suspension of deportation filed before the new law became effective. See IIRIRA § 309(c), published at 8 U.S.C. § 1101 note (Subtitle A of Title III of Division C of Act of Sept. 30, 1996; effective dates; transition). As a result, we address Urban's application under § 244(a)(1) of the INA, formerly codified at 8 U.S.C. § 1254(a)(1).

2. In its response brief the government states that Urban "acknowledged ... she does not send any money to [Ewa] any longer." That statement mischaracterizes Urban's testimony. Urban explained that although she used to send *more* money to Ewa, she can now only afford to send her $100 per month. (A.R.158).

Whenever possible, Urban also sends money to Krystyna, who is struggling to support her four children and her disabled husband. For example, when Krystyna was hospitalized in 1994 and unable to pay her hospital bills, Urban dipped heavily into her savings and sent Krystyna $2,000. Finally, Urban sometimes sends cash to Tadeusz, who supports his wife, two children, and his mother-in-law.

Because Urban is uninsured and suffers from a number of health-related problems, she uses much of her remaining income to pay for her own medical care. For example, since 1990 she has suffered from left ventricular hypertrophy, a chronic heart condition. That condition has, in turn, triggered hypertension, for which Urban must take medication on a daily basis. Finally, Urban suffers from secondary anemia, arthritis, and allergies. Her doctor predicts she will continue to require "pharmacotherapy, including hypertensive medications, NSAID group [nonsteroidal anti-inflammatory drugs], and possible antihistamine with vitamins."

In May 1992 the INS issued an order to show cause why Urban should not be deported. Urban admitted she overstayed her visa but asked for a chance to seek suspension of deportation. An immigration judge gave her 45 days to apply and scheduled a hearing on the matter for October 15, 1992. Urban's request was eventually denied after her lawyer, who has since been disbarred for malpractice in other cases, failed to file her application. Urban then hired a new lawyer, who convinced the immigration judge to re-open her file.

In February 1995, at a new hearing on her request for suspension of deportation, Urban testified to the hardships she would suffer if she were sent back to Poland. She explained she would lose her job and be unable to qualify for a social security pension. She added that, given her age, health, and minimal education, she would be completely unable to find work and left without any means to pay for food, shelter, or medical care. Urban also testified that although her children loved her, they had neither the room nor the resources to take her in. Next, Urban stated that she would suffer emotionally if she were forced to become a burden on the children whom she had been working so hard to support. Finally, she submitted letters from her physicians describing her various ailments and volunteered to submit to an examination by a doctor from the public health service. The INS declined the opportunity to examine Urban.

The immigration judge also heard testimony from two lay witnesses. First, Maria Orzel explained her family's love for Urban and testified that on a recent trip to Poland she witnessed the poor financial state of two of Urban's children. Next, Jaroslaw Cholodecki, a Chicago-based journalist who often travels to his native Poland, receives the daily news from his homeland via wire services, and has a master's degree in economics, testified that Poland's unemployment rate is very high, topping 50 percent in some areas. He added Poland offers only very limited medical care to its poor and that, even in public hospitals, patients must provide much of their own medication and supplies.

The immigration judge found Urban had presented a "sympathetic case" but had not shown she would suffer extreme hardship if deported. He noted although Urban would be completely unemployable in Poland, would not receive social security, and would be forced to live with the children she had been supporting, economic factors alone cannot give rise to extreme hardship. He added that Tadeusz could probably find a way to care for his mother and that being reunited with her children would soften the blow of deportation for Urban. He also concluded Urban's medical problems did not "raise her claim to the level of extreme hardship." He reasoned that she has been able to work despite her ailments and that the Orzels could somehow send her any medicines she couldn't get her hands on in Poland. Finally, the immigration judge granted Urban the privilege of voluntary departure within 1 year. He noted that the INS would probably extend that period if Urban were close to qualifying for social security.

The Board heard Urban's appeal *en banc*, and a majority of its members agreed Urban was not eligible for suspension of deportation because she would not suffer extreme hard-

ship if deported. The Board reasoned her worries were primarily economic in nature and that her children would be able to help her "in some significant manner." After remarking that Urban should have foreseen she could be deported at any time, the Board also dismissed her health-related claims, finding her problems were "not uncommon for someone her age." The Board added there was no evidence in the record to suggest that Urban would be unable to receive adequate medical care in Poland. Four members dissented, and Urban petitioned this court for review.

In order to establish eligibility for suspension of deportation, Urban was required to prove that she: has been physically present in the United States for at least 7 years; is of good moral character; and is "a person whose deportation would ... result in extreme hardship" to herself or her spouse, parent, or child. INA § 244(a)(1). As we mentioned above, the Board found that Urban had not demonstrated she would suffer extreme hardship if returned to Poland.

■ We review the Board's decision for an abuse of discretion. *Kuciemba v. I.N.S.,* 92 F.3d 496, 499 (7th Cir.1996). The Board abuses its discretion when it fails to show that it has properly considered all of the relevant hardship factors or neglects to state its reasons for denying relief. *Cortes–Castillo v. I.N.S.,* 997 F.2d 1199, 1203 (7th Cir. 1993). The Board also abuses its discretion when its decisions concerning an alien's economic hardship lack a rational explanation; depart from established policies; or rest on an impermissible basis such as invidious discrimination. *Palmer v. I.N.S.,* 4 F.3d 482, 486 (7th Cir.1993).

■ "Extreme hardship" has no fixed and inflexible definition. Rather, the Board, who may construe the phrase narrowly, *I.N.S. v. Jong Ha Wang,* 450 U.S. 139, 145, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981) (per curiam), simply determines whether the facts of each case, when considered in the aggregate, establish that the alien will suffer hardship "substantially different from and more severe than that suffered by the ordinary alien who is deported." *Palmer,* 4 F.3d at 487–88 (quoting *Sanchez v. I.N.S.,* 755

F.2d 1158, 1161 (5th Cir.1985)). Among the factors the Board takes into account are the alien's: health, especially when tied to inadequate medical care in the home country; advanced age; length of residence in the United States; and family and community ties in the United States and abroad. *In re Anderson,* 16 I & N Dec. 596 (1978). In addition, although economic detriment alone cannot give rise to extreme hardship, the economic conditions of the country to which the alien is deportable and the financial impact of deportation are relevant to the Board's analysis. *Kuciemba,* 92 F.3d at 499; *Marquez–Medina v. I.N.S.,* 765 F.2d 673, 676 (7th Cir.1985).

■ Urban attacks the Board's extreme hardship determination on every conceivable front. Among other things, she alleges the Board failed to consider her heart condition and ignored Cholodecki's testimony regarding the medical care available to Poland's poor. She also feels the Board ignored her complete unemployability in her homeland and improperly downplayed her desire to qualify for social security. In addition, she asserts the Board's finding that her children could help her in "some significant manner" is contrary to the evidence. Finally, she suggests the Board failed to address the emotional hardship she would suffer if she were forced to become a burden on her struggling children and improperly minimized her plight by holding that she should have foreseen deportation when she overstayed her visa in 1986.

■ We agree with many of Urban's claims. As an initial matter, although economic disadvantage, standing alone, does not qualify as extreme hardship, the total inability to find work can result in more than mere economic injury. *Santana Figueroa v. I.N.S.,* 644 F.2d 1354, 1357 (9th Cir.1981); *Carrete–Michel v. I.N.S.,* 749 F.2d 490, 493 (8th Cir.1984). In *Santana Figueroa,* for example, a 70–year–old, uneducated, unskilled, and disabled Mexican citizen sought suspension of deportation based on his alleged inability to find work in his home country. The Board denied his application, reasoning his claim focused only on mere

economic detriment. The Ninth Circuit reversed, stating:

> In a country with widespread poverty, complete inability to find work can have exceptionally severe personal and noneconomic consequences. For an aged person with no means of support but his own labor, the consequences may include untreated illness, malnutrition or starvation. These bleak prospects cannot rationally be said to fall short of extreme hardship in all cases simply because they are traceable to "economic" causes.

644 F.2d at 1357. We have recognized the qualitative difference between mere economic detriment and an alien's total inability to find work outlined in *Santana Figueroa* but until now have only had occasion to distinguish unsubstantiated allegations of unemployability brought by younger and healthier aliens. *See Bueno–Carrillo v. Landon,* 682 F.2d 143, 147 (7th Cir.1982) (distinguishing *Santana Figueroa* where alien was 51 years old and healthy); *see also Kuciemba,* 92 F.3d at 500 (claim of complete unemployability undercut by the fact that the alien was "young, healthy, and skilled"); *Hernandez–Patino v. I.N.S.,* 831 F.2d 750, 754–55 (7th Cir.1987) (rejecting hardship claim based on limited employment opportunities where factors such as advanced age and illness were "simply not present"); *Marquez–Medina,* 765 F.2d at 676 (rejecting claim of extreme hardship where the alien did not suffer from any "physical or mental impairment which would restrict his employment").

In this case, the immigration judge found that Urban's age, health, lack of education, and Poland's hefty unemployment rate would combine to prevent her from finding any work if deported. The Board did not address that finding. Instead, it merely remarked that Urban's job prospects were typical of an alien "facing deportation to a less-economically stable country." If Urban were young, healthy, and skilled, the Board's statement might ring true. *See e.g., Kuciemba,* 92 F.3d at 500; *Hernandez–Patino,* 831 F.2d at 754–55; *Bueno–Carrillo,* 682 F.2d at 147. However, in light of Urban's age and alleged health problems, the Board's failure to consider her total inability

to find employment is quite troubling. *See Santana Figueroa,* 644 F.2d at 1357. After all, Urban claimed that she suffers from a damaged heart and an assortment of other ailments. In support, she submitted letters from her doctors. But the Board did not address the medical evidence. Rather, it simply stated that Urban's medical problems could not be very severe since she was still able to clean downtown offices at a full-time clip. We fail to see why Urban's ability to maintain employment (when taking prescription hypertension, NSAID group, and allergy medications) somehow renders her medical problems less severe. After all, the evidence showed that Urban is relatively poor and needs to keep working not only to pay for her own health care but also to support her children. And although the government now suggests that the Board might have rejected Urban's medical evidence because it consisted only of "a few letters" which did not describe her ailments in sufficient detail-a questionable claim since the INS bypassed the chance to have a public health service physician examine Urban—we cannot accept post-hoc rationalizations which would "free the Board of the obligation to articulate a reasoned basis for its decisions." *Id.*

In addition, Urban alleged that her health problems could go untreated in Poland because adequate care would be either unavailable or prohibitively expensive. In response, the Board stated there was *no* evidence that Urban would receive substandard care if deported. However, Cholodecki, the Polish journalist, testified that even the poorest patients in Poland's public hospitals must often procure their own medications and supplies, including basic items like syringes. If, as the immigration judge found, Urban cannot find any work (and cannot collect her social security pension because of the Board's deportation order, *see* 42 U.S.C. § 402(n)(1)(A)), how will she afford heart medication and expensive medical supplies? Maybe the Board, like the immigration judge, thought the Orzels could somehow track down the necessary medicine and supplies in Chicago and zip them across the Atlantic. But that does not strike us as anything more than speculation. Or perhaps the Board concluded Urban's

children could chip in for her health care. After all, the Board found they could help their mother in some unidentified but "significant" manner. There is one tiny problem with that finding: the only evidence in the record on this point suggests that Urban's children cannot make ends meet themselves let alone provide food, shelter, and medical care for their mother. Urban testified that she helps to support her kids by sending them food, money, and clothes. She added that all three children live in overcrowded apartments and that Krystyna must support her disabled husband and their four kids. She also explained that Ewa is married to an often-unemployed miner, has two children, and lives with her in-laws. Finally, she testified that Tadeusz has only a very small apartment and has already allowed his mother-in-law to move in. Urban's testimony was corroborated by Maria Orzel, who visited Krystyna and Ewa while traveling in Poland. And although the government repeatedly quotes Urban as stating that Tadeusz would "gladly" take her in, she merely testified that he would gladly house her *if he had somewhere for her to stay.* His willingness to take in his mother has no bearing on his actual ability to do so.

Finally, we note that the Board emphasized that Urban should have foreseen the possibility of deportation when she overstayed her visa in 1986. While this is certainly a factor which the Board may consider when determining whether an alien's circumstances warrant a favorable exercise of discretion, we fail to see how it is relevant to determining whether an alien's· deportation will result in extreme hardship. For even if Urban should have known that she might someday be deported for having elected not to return to a life of poverty in a Soviet-dominated military dictatorship when her visa expired, her decision to stay in this country, made almost 11 years ago, does not somehow reduce the hardship she will suffer if she is now deported to a country in which she has alleged that she will be unable to obtain food, shelter, or adequate medical care. That is, Urban's failure to "foresee" deportation does not mean that she will go less hungry if she cannot find food, less cold if she cannot afford shelter, or less sick if she cannot obtain medical care.

In sum, because the Board failed to properly consider the aggregate effects of Urban's unemployability, medical problems, and prospects for obtaining adequate medical care in Poland, we must conclude that it abused its discretion. As a result, the Board's deportation order is VACATED and Urban's application for suspension is REMANDED [3] for additional consideration. No costs are awarded.

---

**3.** The government had suggested that remanding this case would be pointless in light of *In re N–J–B–,* Interim Decision 3309, 1997 WL 107593 (BIA Feb. 20, 1997) *(en banc).* In that case the Board, by a 7–5 vote, held that under IIRIRA's new transitional rules, the physical presence of an alien seeking suspension of deportation is deemed to have ended when the alien was issued an "Order to Show Cause" pursuant to § 242 of the INA. The government pointed out that Urban entered the United States in August 1985 and was issued an order to show cause in May 1992, less than 7 years later. However, on July 10, 1997, after a district court preliminarily enjoined enforcement of N–J–B–, *see Tefel v. Reno,* 972 F.Supp. 623 (S.D. Fla.1997), the Attorney General vacated the Board's opinion in that case and ordered the Board to refer the matter to her for review. As a result, the government's futility argument is now itself a moot issue.