THOMAS, Chief Judge,
with whom CHRISTEN, Circuit Judge, joins, dissenting:
The government proposes to bar the petitioner from immigration relief simply because is he a recovering alcoholic. It reasons that, because he was diagnosed with the disease during the qualifying period, he categorically must be labeled a “habitual drunkard,” and is per se ineligible for cancellation of removal as someone who lacks good moral character. But the terms *1054 “alcoholic” and “habitual drunkard” are not synonymous, either as a matter of immigration law, or as a matter of fact. For that reason, I would grant the petition for review and remand for the Board of Immigration Appeals (“BIA”) to reconsider the case under a proper construction of the law. Therefore, I must respectfully dissent.
I
A
As we observed more than four decades ago, “[t]he proposition that chronic acute alcoholism is itself a disease, ‘a medically determinable physical or mental impairment,’ is hardly debatable today.” Griffis v. Weinberger, 509 F.2d 837, 838 (9th Cir. 1975). It has been recognized as a disease by the American Medical Association since 1956. American Medical Association, Manual on Alcoholism for Physicians (American Medical Association, 1957). Alcoholism is a neurobiological medical condition, and an individual’s risk of becoming alcoholic depends on a number of factors beyond volitional choice, including genetics and environmental influences. See, e.g., U.S. Dep’t of Health & Human Servs., Office of the Surgeon General, Facing Addiction in America: the Surgeon General’s Report on Alcohol, Drugs, and Health (2016) [hereinafter Surgeon General’s Report]; World Health Org., Neuroscience of Psychoactive Substance Use and Dependence (2004). Indeed, the Surgeon General has rejected the notion that alcoholism and other addictions are moral failings; instead, they are chronic illnesses “that we must approach with the same skill and compassion with which we approach heart disease, diabetes, and cancer.” Surgeon General’s Report at v, 1-2.
Despite this near-universal medical consensus, the government urges that a diagnosis of the disease of alcoholism must categorically mean that someone lacks good moral character and is therefore per se ineligible for cancellation of removal. This view is not supported by the statute, and certainly not by common sense. Perhaps, as some suggest, the phrase “habitual drunkard” is purely anachronistic. That well may be so, as evidenced by the fact that, aside from this case, there is only one reported BIA decision—from more than a half century ago—discussing it. Matter of H, 6 I & N Dec. 614 (1955). But it is still part of the statute and, if the government now intends to invoke it, a more definitive explanation of its meaning is required.
B
Our analysis must begin with the acknowledgment that this case presents serious constitutional questions as to the vagueness of the statute and whether it violates the Equal Protection Clause. In such circumstances, we are instructed to avoid constitutional issues “where an alternative interpretation of the statute is ‘fairly possible.’ ” INS v. St. Cyr., 533 U.S. 289, 299-300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citation omitted). Fortunately, we need not confront those constitutional questions, because an examination of the statute confirms that a diagnosis of the disease of alcoholism does not, as a matter of immigration, mean that a petitioner lacks good moral character as a “habitual drunkard.”
Employing the familiar tools of statutory construction, and mindful of the need to avoid constitutional questions, we look first at the plain words of the statute, “particularly to the provisions made therein for enforcement and relief.” Middlesex Cnty. Sewerage Auth. v. Nat’l Sea Clammers Ass’n, 453 U.S. 1, 13, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). “[W]hen deciding whether the language is plain, we must read the words ‘in their context and with a view to their place in the overall statutory *1055 scheme.’ ” King v. Burwell, — U.S.-, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)). In addition, we examine the legislative history, the statutory structure, and “other traditional aids of statutory interpretation” in order to ascertain congressional intent. Middlesex Cnty., 453 U.S. at 13, 101 S.Ct. 2615. As part of statutory analysis, “[w]e also look to similar provisions within the statute as a whole and the language of related or similar statutes to aid in interpretation.” United States v. LKAV, 712 F.3d 436, 440 (9th Cir. 2013).
The present “good moral character” definition was enacted as part of the Immigration and Naturalization Act of 1952 (“INA”), which defined certain categories of individuals who were, per se, lacking in good moral character, including “habitual drunkard[s],” adulterers, gamblers, persons who gave false testimony for the purpose of obtaining immigration benefits, murderers, and those who had been convicted of a crime and confined to a penal institution for an aggregate of at least 180 days. Public L. 82-414 § 101(f), 66 Stat. 163,172 (1952).
So, did Congress mean to include in the term “habitual drunkard” all individuals who had been diagnosed with alcoholism, or did it intend to distinguish between the two concepts? The text and history of the INA lead to the conclusion that Congressional intent was to create a distinction.
First, Congress well knew how to use the terms “alcoholism” and “alcoholic” in immigration law. In the Immigration Act of 1917, Congress added “persons with chronic alcoholism” to the classes of aliens excluded from admission to the United States. Immigration Act of 1917, Pub. L. No. 64-301, § 3, 39 Stat. 874, 875 (1917) (repealed 1952). With enactment of the INA, Congress repealed many of the provisions of the 1917 Act relating to categories of excludable aliens, but explicitly modified the exclusion provisions to include “[a]liens who are narcotic drug addicts or chronic alcoholics.” 66 Stat 163, 172-73 (1952). “[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.” Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (internal quotation marks omitted); see also Center for Community Action and Environmental Justice v. BNSF R.R. Co., 764 F.3d 1019, 1024 (9th Cir. 2014). Therefore, the structure and context of the INA indicate a Congressional intent to distinguish the phrases. In addition, during the period when the INA was enacted, common public understanding was that the concepts were distinct. For example, Webster’s New World Dictionary— published four years after the passage of the INA—distinguishes between a drunkard and an alcoholic: a “drunkard” is “a person who often gets drunk; inebriate,” whereas an “alcoholic” is “one who has chronic alcoholism.” Webster’s New World Dictionary 17, 231 (1956). Webster’s Collegiate Dictionary, published in 1947, defined “alcoholism” as “a diseased condition caused by excessive use of alcoholic liquors” and a “drunkard” as a “toper or “sot.” Webster’s Collegiate Dictionary (5th ed. 1947). And, as previously observed, the American Medical Association recognized alcoholism as a disease in 1956.
Second, the statutory context of the phrase “habitual drunkard” is critical. It is contained in the definition of “good moral character,” as one of the listed categories of character attributes that preclude relief. 8 U.S.C. § 1101(f)(1). The general concept of “good moral character” as a prerequisite to obtaining immigration benefits *1056 dates back to the adoption of the first naturalization statute in 1790, Act of Mar. 26, 1970, ch. 3, § 1, 1 Stat. 103, and grounded in the notion that an applicant should have spent some time as a resident and then “be able to bring testimonials of a proper and decent behavior.”[1] It deals with one’s character, not one’s medical afflictions.
According to the present statute’s terms, its purpose is to define which individuals necessarily lack good moral character. See 8 U.S.C. § 1101(f) (“No person shall be regarded as, or found to be, a person of good moral character who ... is, or was ... a habitual drunkard.”). Other noncitizens who necessarily lack good moral character—and are therefore categorically barred from receiving discretionary relief—under Section 101(f) are (1) individuals engaged in prostitution, the smuggling of illegal immigrants into the country, or polygamy; (2) individuals “whose income is derived principally from illegal gambling activities” or who have “been convicted of two or more gambling offenses”; (3) individuals who have “been convicted of an aggravated felony”; or (4) individuals engaged in conduct relating to “assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings.” 8 U.S.C. § 1101(f).
Every other category in Section 101(f) describes conduct that results in public harm or harm to others. Under the doctrine of noscitur a sociis, according to which “a word is known by the company it keeps,” S.D. Warren Co. v. Maine Bd. of Env’l Protection, 547 U.S. 370, 378, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006), “habitual drunkard” should apply only to individuals who engage in certain types of harmful conduct. Therefore, an individual’s status as suffering from the disease of alcoholism cannot be sufficient to trigger the “habitual drunkard” provision; being an alcoholic does not necessarily result in public harm or harm to others^.
Third, not only does the context of “good moral character” suggest analysis of conduct, rather than a disease, but the statutory provisions as to the avenue of relief afforded strengthens that conclusion. The phrase “good moral character” is employed in various immigration contexts including naturalization, see 8 U.S.C. § 1427(a)(3), becoming a lawful permanent resident, see 8 U.S.C. § 1255b, adjustment of status, see 8 U.S.C. § 1154, grant of voluntary departure, see 8 U.S.C. § 1229c, and cancellation of removal, 8 U.S.C. § 1229b.
For our contextual purposes, the relevant provision is cancellation of removal and its predecessor statute, suspension of deportation. Relief via suspension of deportation was established by the INA. One of the eligibility requirements for suspension of deportation was that the applicant be someone whose deportation would result in “exceptional and extremely unusual hardship” to the alien or an immediate family member who was a citizen or lawful permanent resident. 8 U.S.C. § 1254(a)(1) (repealed).[2] Among the critical factors in determining the requisite hardship was “health, especially tied to inadequate medical care in the home country.” Urban v. INS, 123 F.3d 644, 648 (7th Cir. 1997); see also In re Anderson, 16 I. & N. Dec. 596, 597-98 (1978) (noting among the relevant factors to be “condition of health” and “severe illness”); In re Louie, 10 I. & N. *1057 Dec. 223, 225 (1963) (granting suspension of deportation based on medical condition of father). In 1962, Congress replaced the “exceptional and extremely unusual hardship” standard with “extreme hardship.”
In 1997, Congress eliminated the remedy of suspension of deportation, and replaced it with “cancellation of removal,” which is the operative statute in this case. 8 U.S.C. § 1229b. Eligibility for relief was still predicated on hardship, with a stricter standard returning to the original language of “exceptional and extremely unusual hardship,” and limiting the hardship determination to qualifying relatives. Id. Medical condition continued to be an important factor in determining eligibility for relief. See, e.g., Fernandez v. Gonzales, 439 F.3d 592, 601-02 (9th Cir. 2006) (noting it would be error for the BIA to refuse to hear evidence of a life-threatening medical condition in the context of cancellation of removal); see also In re Gonzalez Reciñas, 23 I. & N. Dec. 467, 470 (2002) (noting that the new hardship standard “is not so restrictive that only a handful of applicants, such as those who have a qualifying relative with a serious medical condition, will qualify for relief.”). In short, medical condition and health have always been important considerations in determining hardship, either through suspension of deportation or cancellation of removal. Thus, it would be inconsistent with the statute, when considered in context, to construe it to mean that the disease of alcoholism, by itself, would per se disqualify a petitioner from relief when the establishment of a serious medical condition can be a qualifying factor.
Fourth, in a different section of the INA, Section 212(a)(l)(A)(iii), Congress demonstrated a more nuanced understanding of alcohol dependence. There, it established that a noncitizen is inadmissible if he or she “is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General) to' have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others.” See 8 U.S.C. § 1182(a)(l)(A)(iii)(I); see also 8 U.S.C. § 1182(a)(l)(A)(iii)(II). An implementing regulation treats alcoholics as having a “physical or mental disorder” for the purpose of inadmissibility under this statute. See 42 C.F.R. 34.2(n); Am. Psychiatric Ass’n, supra; Center for Disease Control & Prevention, Technical Instructions for Physical or Mental Disorders with Associated Harmful Behaviors and Substance-Related Disorders for Civil Surgeons (2013), available at http://tinyurl. com/jqaggoo. It is important to emphasize, however, that this statute only refuses admissibility to alcoholics whose alcohol-related behavior “pose[s] ... a threat to the property, safety, or welfare of the alien or others.” 8 U.S.C. § 1182(a)(l)(A)(iii)(I). It does not exclude alcoholics based on an outdated stigma that they are categorically immoral.
Finally, as we have noted, the assessment of good moral character in the immigration context requests the agency to “weigh and balance the favorable and unfavorable facts or factors, reasonably bearing on character, that are presented in evidence.” Torres-Guzman v. INS, 804 F.2d 531, 534 (9th Cir. 1986). Although this general concept does not construe the “habitual drunkard” provision, it reinforces the idea of the general purpose of the statute, and the need for a case-by-case determination. Consistent with this approach, courts have declined to find a lack of good moral character based on isolated alcohol-related conduct. For example, several district courts have held that a single conviction for driving under the influence (“DUI”)—and sometimes more than one— cannot render someone a person of bad *1058 moral character under Section 101(f). See, e.g., Rangel v. Barrows, No. 4:07-cv-279, 2008 WL 4441974, at *4 (E.D. Tex. Sept. 25, 2008) (“[T]he applicable law is unanimous in support of the proposition that, in the absence of aggravating factors, a single [DUI] conviction is insufficient to deny an application for naturalization on the basis that the applicant lacks good moral character.”); Ragoonanan v. U.S. Citizenship & Immigration Servs., No. 07-3461 PAM/JSM, 2007 WL 4465208, at *5 (D. Minn. Dec. 18, 2007) (holding that “a single [DUI] conviction resulting in probation” is insufficient to establish bad moral character); Yaqub v. Gonzales, No. 1:05-cv-170, 2006 WL 1582440, at *4 (S.D. Ohio June 6, 2006) (concluding that “two DUI arrests” are insufficient to find petitioner lacks good moral character); Le v. Elwood, No. Civ.A. 02-CV-3368, 2003 WL 21250632, at *3 (E.D. Pa. 2003) (concluding that two DUI convictions, did not, standing alone, “amount to a finding of ‘habitual drunkard’ ”).
In addition, the statutory construct of “good moral character” has also embraced the concept of redemption. See, e.g., Santa-maria-Ames v. INS, 104 F.3d 1127, 1132 (9th Cir. 1996) (“Whether the petitioner can establish that he has reformed and rehabilitated from this prior conduct is germane to the determination of whether he has established good moral character... .”); Yuen Jung v. Barber, 184 F.2d 491 (9th Cir. 1950) (noting that if a prior bad act precluded one from establishing good moral character, “would require a holding that Congress had enacted a legislative doctrine of predestination and eternal damnation”) Here, however, the government’s proposed holding would mean that all sober, recovering alcoholics who were diagnosed during the seven year qualifying period would necessarily be considered “habitual drunkards” and categorically ineligible for relief. The construction more consistent with the statute would be to allow the agency to consider and balance the equities of each individual circumstance on a case by ease basis.
In short, when we consider the plain language of the statute, its structure, and its legislative history, we must conclude ■that the phrase “habitual drunkard” is not synonymous with “alcoholic.” Thus, a diagnosis of the disease of alcoholism is insufficient to trigger the “habitual drunkard” provision, and render a petitioner categorically ineligible for discretionary cancellation of removal relief.
Instead, the phrase “habitual drunkard” is best understood in the context of its statutory setting of “good moral character,” which has commonly been understood to reflect, as Judge Learned Hand put it, the “common conscience” of the community. Johnson v. United States, 186 F.2d 588, 590 (2d Cir. 1951). To that end, courts have generally focused on whether the challenged conduct is harmful to the public, or whether it is purely private. See Nemetz v. INS, 647 F.2d 432, 436 (4th Cir. 1981) (noting that the appropriate analysis “is whether the act is harmful to the public or is offensive merely to a personal morality.”); In re Labady, 326 F.Supp. 924, 927 (S.D.N.Y. 1971) (“The most important factor to be considered is whether the challenged conduct is public or private in nature.”).
Thus, in context, the best construction of “habitual drunkard” within the “good moral character” definition is one who habitually abuses alcohol and whose alcohol abuse causes harm to other persons or the community. This interpretation is consistent with the statutory language, structure, and context, and avoids any constitutional infirmity.
To be sure, an alcoholic may also fit the definition of “habitual drunkard” by conduct that causes harm to others or the public. But to' say that status of being *1059 diagnosed an alcoholic always means that one is a “habitual drunkard,” is not consistent with the statute.
II
A proper construction of the phrase “habitual drunkard” is critical to the outcome of this petition. Mr. Ledezma-Cosi-no has been in the United States for twenty years. He works in construction, specializing in cement masonry and concrete finishing. He and his wife have eight children, five of whom are United States citizens. At his first immigration hearing, he admitted removability, but applied for cancellation of removal and voluntary departure under 8 U.S.C. § 1229b-c. In support of his application for cancellation of removal, he contended that his removal would result in exceptional and extremely unusual hardship to his children because of economic disadvantage, the difficulties of adjusting to life in Mexico, and his youngest daughter’s asthma. At the first hearing, the immigration judge (“IJ”) found, on the merits, that Ledezma-Cosino had not established the statutory hardship requirement. The IJ denied cancellation of removal, but granted voluntary departure.
Ledezma-Cosino appealed to the BIA. The BIA remanded the case because the trial transcript was defective because there was no record of the last witness, Ledez-ma-Cosino’s daughter, Yadira Ledezma. The BIA instructed the IJ to complete the record.
At the first post-remand hearing, the government attested to the IJ that there had been no negative developments as to Ledezma-Cosino between the hearings. At the scheduled second hearing, counsel requested a continuance because Ledezma-Cosino had been hospitalized with a liver ailment. At a subsequent scheduling hearing, counsel presented medical records to show that his client had been hospitalized.
At the hearing on the merits, the judge placed the medical records into the record himself. Yadira L.edezma testified, as well as Ledezma-Cosino. The judge questioned both about Ledezma-Cosino’s drinking because it had been reflected in the medical records. Ledezma-Cosino testified that he had. been sober since the hospitalization. At the conclusion of the testimony, the government argued that he had not satisfied the hardship requirement and questioned whether he had been truthful on his application. The government did not argue that he was categorically ineligible for relief because he was a “habitual drunkard.”
The IJ then, sua sponte, declared Le-dezma-Cosino ineligible for relief because he was a “habitual drunkard,” and also denied voluntary departure for that reason. The BIA dismissed his appeal on the sole basis that he is a “habitual drunkard” and therefore failed to “me[e]t the requisite period of good moral character” required for discretionary relief. In reaching this conclusion, the BIA considered only that Ledezma-Cosino (1) was hospitalized for a serious liver condition in 2010 and drank alcohol excessively for a year leading up to his hospital visit, (2) had a decade-long alcohol dependency, (3) was an alcoholic according to his daughter’s testimony, and (4) was convicted of a DUI in 2008.
Aside from the DUI conviction, there was no evidence in the record of any harm to the public or others. Indeed, the only evidence was that he was an excellent worker. Thus, if the evidence pertaining to his diagnosis of alcoholism is set aside, there was not sufficient evidence to sustain the determination of ineligibility for cancellation or voluntary departure based on the “habitual drunkard” clause.
Therefore, I would remand this petition to the BIA for application of the correct statutory standard or, to the extent there *1060 is remaining statutory ambiguity, for it to determine the meaning of the phrase “habitual drunkard” in a way that does not make the phrase synonymous with “alcoholic.”
Whether or not the agency would ultimately grant relief in this case is a separate question. In the end, the decision as to whether an applicant is afforded discretionary cancellation of removal is committed solely to the executive branch, not subject to our review. But legal eligibility for relief is subject to our review, and it is important for future cases of those who seek relief, and the attorneys who represent them, that the law is accurately defined. Given the government’s new reliance on what had been considered an antediluvian phrase, resolution of its meaning is particularly critical.
Because I would resolve the petition on the basis of statutory interpretation, or remand, I would not reach the constitutional questions raised in this case.
For these reasons, I respectfully dissent.

. 1 Annals of Congress 1154 (1790) (Joseph Gales ed., 1834) (statement of Rep. Jackson).

. The other two requirements were that the applicant had been physically present in the United States for a continuous period of not less than seven years immediately preceding the application date, and was a person of good moral character during that period. 8 U.S.C. § 1254(a)(1) (repealed).